IN THE MATTER OF THE PETITION OF HANS-OLA T. MALMSTEDT FOR THE ADOPTION OF A MINOR CHILD

[No. 437, September Term, 1965.]

*Decided June 6, 1966.*

*Dissenting opinion filed June 17, 1966.*

The cause was argued before PRESCOTT, C. J., and HAM-MOND, HORNEY, MARBURY and BARNES, JJ.

*Joseph H. Sharlitt,* with whom was *Neal E. Krucoff* on the brief, for appellant.

*H. Emslie Parks,* with whom were *Parks & Parks* on the brief, for the Church Mission of Help, part of appellees and by *Samuel S. D. Marsh* for other appellee.

PRESCOTT, C. J., delivered the majority opinion of the Court. HORNEY, J., dissents. Dissenting opinion at page 97, *infra.*

Although the factual situation here presented is novel to this Court, the opinion need not be an extended one. In adoption proceedings relative to minors, the primary matter for consideration by the court is still the best interest of the minor.

On March 2, 1965, the appellant filed a petition seeking to adopt his illegitimate child, born in January of that year. At

that time, he was 21 years old and the mother of the child 19. The child was in a licensed child placement agency, where she had been entered by her mother. The appellant's paternity was and is undisputed. Neither of the parents have ever married. The petition for adoption was not accompanied by the mother's consent thereto or by the consent of the placement agency as ordinarily required by Code (1965 Cum. Supp.), Article 16, Section 74 (d) and (g). The trial judge held that the mother had not lost her parental rights, that she had not consented to the adoption, and she had not withheld her consent contrary to the best interest of the child; hence he denied the adoption petition, and the father appealed.

We shall proceed quickly through the arguments that lack merit, and reach the nub of the case as soon as possible. Appellant argues that Code (1965 Supp.) Article 16, §§ 66A-66P, the statutes relating to bastardy proceedings, grant him certain rights and standing in this adoption proceeding. We have carefully considered this contention, but find nothing in the statutes named to aid him under the circumstances here involved. Unlike some of the States, Maryland has not seen fit to grant specific rights to fathers of illegitimate children in regard to adoption (adoption proceedings being purely and entirely statutory in nature). On the contrary, subsection (d) requires his consent only when he is alive and the child "has been legitimated according to the laws of any jurisdiction," a situation not existing here.

He also claims that the mother has lost her parental rights through voluntary relinquishment and abandonment to the child placement agency (subsection [d], *supra*); consequently, her consent was not necessary. Subsections (d) and (g), *supra,* require either the consent of the mother or the consent of the child placement agency, if the mother has relinquished her parental rights to it; so, whether or not the mother has relinquished her parental rights is of no significance here, for if she has, or has not, our present question for determination boils down to a question of fact as to whether she or the agency (it has filed a brief in support of the mother's position) has withheld consent "contrary to the best interest of the child." Section 74, *supra*.

The appellant seems to think that the trial judge found him

unfit to raise a child. This is not true. It was unnecessary for the judge to reach that question, and we do not reach it either. Our only question is to determine what the welfare of the child demands.

At the outset the Court wishes to state that it is impressed with the truthfulness and candor of the parties and their witnesses, a situation that does not always prevail in vigorously contested litigation.

The appellant is a young unmarried man (with no present plans for marriage) who, by his own admission, is unable to care for the child if his petition were granted. His present financial worth is "approximately zero," with his parents paying his college expenses, except what it is "possible" for him to pay. His plans were to continue and to complete his college education, which would require at least 2 years. During those two years, the child would live with his mother, 54 years of age, and his father, who is 50, both of whom are in good health, in an apartment consisting of 2 bedrooms, living room, kitchen and bath. Appellant's father is frequently long distances from home for extended periods of time, due to his employment. Appellant's mother is a "domineering" person, according to one physician, who "often pressured the petitioner and influenced him with many decisions," which "was mainly the core of many of [his] problems while under [psychiatric] treatment." The college to be attended by the appellant is some 95 miles from his parents' apartment. The appellant testified that all of his close friends had already been informed of the present situation, that they will be informed of the outcome thereof, that he felt that such knowledge by his friends and people in the community will not be "detrimental," and that he will tell the child, at whatever age she might inquire, the truth concerning her birth and background.

After entering college in 1961, appellant withdrew twice, and, at the time of the hearing below, had completed only three semesters. After the second withdrawal, he received psychiatric counseling and was later, after examination classified 1-Y (not eligible for service unless actual emergency exists, according to appellant) by the Selective Service officials.

We have examined with care the testimony of the two ex-

pert witnesses offered by the appellant, but due to their very short acquaintances and brief interviews with the appellant, the plain, uncontroverted facts of this case, and our own rather extensive experience in this particular field, we have not found their opinions to be of substantial aid in the decision we must make.

One witness, with about 35 years' experience in child placement, stated it was "unheard of" to place children with an unmarried male, and she could not "think of anything [the great many problems that could arise in the event that the petition were granted] that would be worse for a child's security."

The trial judge had the County Department of Parole & Probation investigate matters relative to the petition. In a very comprehensive and skillful report, it was recommended that, if the two young people would not get married, the petition be denied. And we have already mentioned that the licensed child placement agency where the child now is (one with many years' experience) likewise recommended a denial.

If the action of the Chancellor be sustained, the agency is ready to proceed with a normal, customary adoption proceeding, whereby the child will be placed in a suitable home with a father and a mother.

We have frequently said that in cases of this nature that unless there is some reason to the contrary, the findings of the Chancellor will not be disturbed. *Andrews v. Andrews,* 242 Md. 143. *Raible v. Raible,* 242 Md. 586. Hence, our only duty is to determine whether there is cause to set aside the Chancellor's finding that the mother's (or agency's) consent was not withheld contrary to the welfare of the child.

The facts, we think, speak for themselves, and it would be rather useless to point out in detail all of the reasons that sustain the Chancellor's ruling. It should be apparent to all that through infancy, adolescence, and young lady-hood it will be decidedly more advantageous to be raised in a normal, wholesome home with a mother and a father, than to be reared as an illegitimate child by the father alone, with the many potential, possible complexities and problems attendant to such a rearing. It is obvious to us that the facts impelled the Chancellor's holding; consequently, we not only find no reason to disturb his

ruling, but state that had it been otherwise, we would have had to change it.

*Decree affirmed; appellant to pay the costs.*

HORNEY, J., filed the following dissenting opinion.

I agree with the majority that the primary matter for courts to consider in the adoption of minors is the best interests of the child, but I do not agree that the adoption by strangers of the baby girl who is the subject of this unfortunate familial feud will inevitably be in her best interests. Rather the unusual circumstances of this case indicate that the natural father (who wants her) should have been permitted to adopt the child who, but for the callousness of the natural mother (who does not want her), would have been legitimated by the marriage of her parents. Neither the laws of God nor the laws of man forbid adoption by the natural father. The father has clearly demonstrated his love for the child by seeking her adoption. There was no finding, as the majority pointed out, that the father was unfit to rear the child. And, which is more important, the child, had she been allowed to become the adoptive daughter of her natural father, and despite his present unsettled plight, would have lived with and been provided for with care and affection by blood relatives—her paternal grandparents—who are undoubtedly also devoted to the child.

Nor do I agree, had the father been permitted to adopt his daughter, that she would have been "reared as an illegitimate child" for, had the adoption been granted, the child would in law have become a legitimate daughter. In that event the situation would have been the same had her parents married and her mother thereafter died. Had that happened—as in effect it did since the mother by giving up her parental rights and putting the child out for adoption has died at least so far as the child is concerned—the father would undoubtedly have taken the child to his parents, there being no impediment to hinder him, to be reared by them for the time being as the father had planned had his petition to adopt the child been granted.

I would reverse the decree denying adoption and remand for

98

such further proceedings as might be necessary to safeguard the best interests of the child pending her eventual adoption by the natural father.